David N. Lake, State Bar No. 180775
**LAW OFFICES OF DAVID N. LAKE,**
  **A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Telephone: (818) 788-5100
Facsimile: (818) 479-9990
david@lakelawpc.com


Attorneys for Plaintiffs


# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION


| | |
|---|---|
| MAZLIACH GAMLIEL AND PNINA GAMLIEL, INDIVIDUALLY AND AS TRUSTEES OF THE GAMLIEL FAMILY TRUST DATED JULY 31, 2008,<br><br>        Plaintiffs,<br><br>vs.<br><br>STATE FARM GENERAL INSURANCE COMPANY, AN ILLINOIS CORPORATION, AND DOES 1 TO 25, INCLUSIVE<br><br>        Defendants. | Case No. 2:21-cv-03427 MWF (DFMx)<br><br>(Case Assigned to Hon. Michael W. Fitzgerald)<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND/OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:        March 7, 2022<br>Time:        10:00 am<br>Courtroom.:  5A |

Case 2:21-cv-03427-MWF-DFM    Document 16    Filed 02/14/22    Page 2 of 28   Page ID #:500

# **Table of Contents**

I.    INTRODUCTION ..................................................................................... 1

II.   ARGUMENT ......................................................................................... 3

  A.  THE POLICY LANGUAGE, ITS BROAD INTERPRETATION, AND
  DEFENDANT'S BURDEN. ........................................... 3

  B.  THERE ARE DISPUTED ISSUES OF FACT REGARDING THE
  NATURE AND TIMING OF THE PIPE BURSTING AND THUS
  WHETHER IT IS SUDDEN OR EXCLUDED. .......................... 8

  C.  THERE ARE DISPUTED ISSUES OF FACT REGARDING
  EXCLUSION FROM COVERAGE DUE TO WEAR, TEAR OR
  DETERIORATION. ............................................. 12

  D.  SUMMARY JUDGMENT CANNOT BE GRANTED BECAUSE
  PLAINTIFFS ARE ENTITLED TO SOME COVERAGE. .............. 14

  E.  THE DISPUTED ISSUES OF MATERIAL FACT PRECLUDING
  SUMMARY JUDGMENT OF THE BREACH OF CONTRACT CLAIM
  ALSO PRECLUDE SUMMARY JUDGMENT OF THE SECOND CAUSE
  OF ACTION. ................................................. 15

  F.  DEFENDANT MISHANDLED THE CLAIM AND ACTED
  UNREASONABLY, EVEN HOSTILY, TOWARDS PLAINITFFS. ...... 16

  G.  THE QUESTION OF PUNITIVE DAMAGES IS THE SUBJECT OF
  DISPUTED MATERIAL FACTS AND MUST BE LEFT TO A JURY TO
  DECIDE. ................................................... 21

III.  CONCLUSION ..................................................................................... 23

Opposition to Motion for Summary Judgment

2

## Table of Authorities

**Cases**

Bank of the West v. Superior Court
    2 Cal.4th 1254 (1992)........................................................................................ 4

Betts v. Allstate Ins. Co.
    154 Cal.App.3d 688 (1984) ........................................................................... 22

Brodzinski v. State Farm Fire & Cas. Co.
    (E.D. Pa.) 2017 WL 3675399 ......................................................................... 6

Brown v. Mid-Century Ins. Co.
    215 Cal.App.4th 841 (2013) ........................................................................... 7

Downey Sav. & Loan Assn. v. Ohio Cas. Ins. Co.
    189 Cal.App.3d 1072 (1987) ......................................................................... 19

E.M.M.I. Inc. v. Zurich American Ins. Co.
    32 Cal.4th 465 (2004)..................................................................................... 5

Fifth v. State Farm Ins. Co.
    (D.N.J.) 2014 WL 1253542 ........................................................................... 6

Freedman v. State Farm Ins. Co.
    173 Cal.App.4th 957 (2009).......................................................................... 5

Gentry v. State Farm Mut. Auto Ins. Co.
    726 F.Supp.2d 1160 (E.D. Cal. 2010) .......................................................... 15

Gershkowitz v. State Farm General Insurance Co.
    (C.D. Cal., Dec. 29, 2021) 2021 WL 6752322............................................. 10

Griffin Dewatering Corp. v. Northern Ins. Co. of New York
    176 Cal.App.4th 172 (2009)......................................................................... 20

Gruenberg v. Aetna Ins. Co.
    9 Cal.3d 566 (1973)...................................................................................... 19

Jordan v. Allstate Ins. Co.
    148 Cal.App.4th 1062 (2007)................................................................... 15, 19

Kinsale Insurance Company v. Golden Beginnings, LLC

    (C.D. Cal., Sept. 15, 2021) 2021 WL 4205059, at *5 ................................. 4

Lawson v. Nationwide Mut. Fire Ins. Co.

    (D.S.C., May 3, 2010) 2010 WL 1791283, at *2 ....................................... 10

MacKinnon v. Truck Ins. Exchange

    31 Cal.4th 635 (2003) ................................................................................ 4

Mariscal v. Old Republic Life Ins. Co.

    42 Cal.App.4th 1617 (1996) ...................................................................... 16

Murray v. State Farm Fire & Casualty Co.

    219 Cal.App.3d 58 (1990) ......................................................................... 14

O'Brien as Trustee of Raymond F. O'Brien Revocable Trust v. XPO CNW, Inc.

    (N.D. Cal. 2018) 362 F.Supp.3d 778 ....................................................... 21

Pulte Home Corp. v. American Safety Indemnity Co.

    14 Cal.App.5th 1086 (2017) ...................................................................... 22

Stewart v. Truck Ins. Exchange

    17 Cal.App.4th 468 (1993) ........................................................................ 21

Waller v. Truck Ins. Exchange, Inc.

    11 Cal.4th 1 (1995) ................................................................................... 15

Ward v. Allstate Ins. Co.

    (C.D. Cal. 1997) 964 F.Supp. 307 ........................................................... 22

West Coast Hotel Management, LLC v. Berkshire Hathaway Guard Insurance Companies

    (C.D. Cal. 2020) 498 F.Supp.3d 1233 ....................................................... 5

Wilson v. 21st Century Ins. Co.

    42 Cal.4th 713 (2007) ............................................................................... 19

## I.    INTRODUCTION

Defendant State Farm General Insurance Company ("Defendant") has done what insurance companies are known to do – deny a legitimate claim in hopes that the insured does not have the stamina to pursue its rights secured by way of its repeated payment of premiums to safeguard the protections of an insurance policy.  Defendant may have denied Plaintiffs Mazliach Gamliel and Pnina Gamliel's (together "Plaintiffs") claim per its usual business model, but these Plaintiffs are standing up for their rights.

Not surprisingly, Defendant innocently suggests that it was just following the terms of the insurance policy when it denied Plaintiffs' claim and that, in so doing, they cannot be held liable.  Defendant has surely made this argument thousands of times in the past, but its liability in *this* instance, in connection with *this* policy, as to *these* Plaintiffs, and *this* property, must be determined by the facts, issues, and circumstances of *this* case, not in the abstract.

When that is done, when the facts, issues, and circumstances of this case are considered and examined, and the exclusionary clauses are interpreted narrowly against the insurer as required by law, it is clear that summary judgment, either in whole or part, is improper because there is an abundance of disputed issues of material fact which must be determined by a jury.

Defendant began by insisting, wrongly, that the pipe was under the foundation.  Statement of Disputed Material Facts ("DMF"), 1.  Then it shifted to an exclusion about the leak being continuous.  DMF 2.  Neither of Defendant's positions is correct and the law is clear that when there is a dispute of fact regarding whether the leak was "continuous," summary judgment may not be granted.  Defendant relies on disembodied graphs and testimony from a City employee with no personal knowledge of what transpired at the property.  Yet, Defendant claims, without concrete evidence or first-hand testimony, that there was a protracted "pinhole" leak.  By contrast, Plaintiffs have brought forth

solid admissible evidence from eyewitnesses that this loss was caused by a sudden pipe burst that caused a large hole.  DMF 3-10, 16-17, 25-26 & 38.

Defendant's own authorities demonstrate how different this case is. Specifically, those cases involved tiny pinhole leaks, odors, and mold or fungus infestation typically associated with slow, protracted drips which were either confirmed by the insurer's inspection or uncontested by the insured.  By contrast, this case involves a large hole (not a pinhole), a complete lack of mold and a water bill that suddenly increased by $644 (a 254% increase).  DMF 3-10, 16-17, 25-26 & 38.  Moreover, there was a concurrent toilet leak at the Property, making it practically impossible for Defendant to overcome its burden of proving just when the pipe in question burst. DMF 14, 15, 28, & 49.

Additionally, Defendant acted in bad faith by ignoring glaring evidence that supported coverage.  In fact, from the moment the insured had its first substantive discussion with the claims department it took Defendant just five days to deny coverage, with that determination communicated swiftly at the conclusion of a 15 minute virtual inspection without any reflection or deliberation by Defendant. DMF 33-36.  Defendant never asked to look at the pipe, gave no consideration to the concurrent leaky toilet, and ignored the fact that there was no mold or other evidence of long-term leakage present.[1]  DMF 5-10, 22, 24, 25, 28 & 34.   Such willful ignorance of facts supporting coverage warrants a finding of bad faith as well as imposition of punitive damages.

///

---

[1] Defendant places undue emphasis on the fact that Plaintiffs observed no water on the marble floors.  This is not determinative of anything.

## II.    ARGUMENT

### A. <u>THE POLICY LANGUAGE, ITS BROAD INTERPRETATION, AND DEFENDANT'S BURDEN</u>.

There is no dispute about the policy being in place (policy 71-GS-D348-2), or that it was in full force and effect at the time of the incident and for the property in question (the "Policy").  The Policy provides relevant coverage as follows:

**COVERAGE A – DWELLING**  1. Dwelling. We cover the dwelling used principally as a private residence on the residence premises shown in the Declarations.  Dwelling includes: a. structures attached to the dwelling; b. materials and supplies located on or adjacent to the residence premises for use in the construction, alteration or repair of the dwelling or other structures on the residence premises; c. foundation, floor slab and footings supporting the dwelling; and d. wall-to-wall carpeting attached to the dwelling.

The Policy also provides for Loss of Use coverage as follows:

**COVERAGE C - LOSS OF USE**  1. Additional Living Expense. When a Loss Insured causes the residence premises to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 24 months. Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the premises; (b) the time required for your household to settle elsewhere; or (c) 24 months. This coverage is not reduced by the expiration of this policy. The Policy further states:

**SECTION I - LOSSES INSURED**

**COVERAGE A - DWELLING**

We insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION I - LOSSES NOT INSURED.**

The Policy is far less clear about what is ***not*** covered, perhaps intentionally so in order to give Defendant "wiggle room" and an ability to adopt and apply exclusions with unfettered and unchecked discretion.  This is where the Policy's California Endorsement (item 4.c.) comes into play as it supplants that language in the main policy and seeks to exclude from coverage damage caused by "continuous or repeated seepage or leakage of water or steam…."

"[A] court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy." Bank of the West v. Superior Court, 2 Cal.4th 1254, 1265 (1992). In addition, when considering the applicability of the exclusion, it is well recognized that the Court must be mindful of the fact that "***insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured ... [whereas] exclusionary clauses are interpreted narrowly against the insurer. ... Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. The exclusionary clause must be conspicuous, plain and clear***. This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded." MacKinnon v. Truck Ins. Exchange, 31 Cal.4th 635, 648 (2003) (emphasis added) (internal citations and quotations omitted); Kinsale Insurance Company v. Golden Beginnings, LLC (C.D. Cal., Sept. 15, 2021) 2021 WL 4205059, at *5 ("While insurance "coverage is interpreted broadly so as to afford the greatest possible protection to the insured," "exclusionary clauses are interpreted narrowly against the insurer.") (citation omitted); West Coast Hotel Management, LLC v. Berkshire Hathaway Guard Insurance Companies (C.D.

Cal. 2020) 498 F.Supp.3d 1233, 1241 ("Typically, the insurer bears the burden of proving the applicability of an exclusion.")

The phrase "continuous or repeated" is vague and ambiguous – it is not defined anywhere in the document despite the fact that the Policy includes two pages dedicated to specially defined terms. A determination regarding this ambiguity cannot be decided in the abstract, but rather must be made on an individual case-by-case basis applying the language to the specific facts of the case. E.M.M.I. Inc. v. Zurich American Ins. Co., 32 Cal.4th 465, 470 (2004). Here, there is no actual evidence of long-term or continuous leaking – there is no evidence of mold, rot or other deterioration associated with a "continuous or repeated seepage or leakage of water" where the pipe burst. Plaintiffs' objectively reasonable expectation is that coverage would be available for a burst pipe, a sudden water intrusion event like the one at issue.

So, while Courts may have found an exclusion based on "continuous or repeated seepage or leakage of water" to be valid, that is neither the point nor the issue in this case. The question is what "continuous or repeated" means in the context of this particular case, making the cases cited by Defendant distinguishable on their facts alone (and for other reasons):

- Freedman v. State Farm Ins. Co., 173 Cal.App.4th 957 (2009): The Court found the exclusion applied, but the hole was miniscule (the court noted the "small size of the hole") and State Farm's own briefing (2008 WL 3999884) establishes just how distinct those facts are from those now before the Court. "*Five (5) years* after a contractor negligently pierced a plumbing pipe with a nail, causing it to eventually deteriorate and leak, Plaintiffs presented a claim to State Farm for water damage and *mold* . . . [T]here is no evidence in the record that upon inspection, there was any sign that there was one and only one catastrophic burst of water from the pipe and the type of water saturation seen in the drywall is consistent with

long-term continuous repeated seepage or leakage. . . ***The extent of saturation from the pin hole leak rationally could only exist from long term, continuous drip, drip, drip***." (Emphasis added).   Moreover, the evidence that the leak had continued for a long time was undisputed. The parties stipulated that "extensive water leakage was discovered in the upstairs bathroom wall. One wall was discolored and wet. The drywall fell apart on touch and mold was seen on pieces of the wall. The tile floor was wet and the ceiling immediately downstairs was wet and soft." Id. at 960. Based on those agreed facts, the trial court granted summary judgment and ultimately reasoned: "Given the small size of the hole(s) through which the water leaked, and given the extensive amount of water damage ..., the leak must have lasted a sufficiently long time, or stopped and started sufficiently many times, to count as "continuous" or "repeated" under any reasonable construction of those terms."  Id. at 964.

- 	Brodzinski v. State Farm Fire & Cas. Co. (E.D. Pa.) 2017 WL 3675399:   This case from a different court in a different jurisdiction denied coverage under the same clause at issue here, but there the evidence clearly established the "continuous and repeated" nature of the leak.  State Farm's adjuster went to the property and "observed ***evidence of mold, rot, and deterioration damage to the building materials***" and was told "that bleach was sprayed onto the carpet and walls in an ***attempt to remove the mold***."  Id. at * 1 (emphasis added).   State Farm thus concluded that "the Policy did not cover the water damage in Plaintiff's basement because the damage appeared to be caused by a repeated leakage of water from multiple sources that had caused mold, rot, and deterioration." Id. at * 3.

- 	Fifth v. State Farm Ins. Co. (D.N.J.) 2014 WL 1253542: Another case from a different court in a different jurisdiction where coverage was

denied under the same clause at issue here, but again under quite a divergent set of facts. "In early September 2010, Mrs. Pennington noticed a "fleeting odor" (a few seconds) in the kitchen by an open window near a field. Mrs. Pennington told her husband about the "funny smell," but he "blew it off." In late September 2010, Mrs. Pennington noticed that the wooden threshold connecting the kitchen and dining room floors had "popped up and buckled." When Mrs. Pennington pointed out the damaged threshold to her husband in late September 2010, he agreed that "something's wrong" and that they needed to call a plumber. Plaintiffs called Joseph Griesbach from Plumber Joe's Plumbing who went to plaintiffs' house on October 12, 2010. When Mr. Griesbach went into the crawlspace underneath the kitchen, he discovered "steam or vapor spraying out of a small rot hole in the copper ice maker supply line ." He also found "an enormous amount of water damage and a lot of mold growth throughout the crawlspace." Id. at 1.[2]  State Farm's inspector went to the property and "concluded that the ***leak was on-going for a long period of time to support the continued fungal amplification (mold growth) over an extended area in the crawlspace and to penetrate/migrate up through the floor decking into the kitchen***." Id. at 2 (emphasis added).

-      Brown v. Mid-Century Ins. Co., 215 Cal.App.4th 841 (2013):  In this case, the defendant insurance company's expert opined (without opposition) that the "hot water which first escaped from the pipe was in the form of drips into the concrete which surrounded the pipe. As the size

---

[2] The inspector in Fifth observed "200 square feet of visible mold growth" and noted a "strong musty odor." Id. at * 4.  This was undisputed.

of the hole slowly increased, this dripping gradually turned into leakage. Eventually, the escaping water migrated to the adjacent dirt floor of the nearby crawlspace and slowly pooled there. This unabated continuous dripping and leaking *lasted at least five month*s until the leak was discovered and the water turned off on March 17, 2009." Id. at 849 (emphasis added). In granting summary judgment, the trial court noted, "everybody agrees that this was something that occurred over a period of time." Id. at 852. In fact, and unlike in the case at bar, the evidence in Brown showed "*pervasive, visible mold and moisture on the interior walls of each level*" of the plaintiff's home. Id. at 846-847 (emphasis added).

## B. THERE ARE DISPUTED ISSUES OF FACT REGARDING THE NATURE AND TIMING OF THE PIPE BURSTING AND THUS WHETHER IT IS SUDDEN OR EXCLUDED.

There is a fundamental dispute between the parties regarding the nature of the leak and that fundamental dispute goes to the very heart of the issues in this case. In an effort to bolster its disclaimer of coverage, Defendant characterizes the leak as being "continuous" which would then in turn make it an uninsured loss under the Policy. However, Plaintiffs have produced substantial evidence to the contrary, strongly suggesting that the leak was not continuous. California courts have ruled that when a genuine dispute exists as to this very exclusion, summary judgment may not be awarded. Gershkowitz v. State Farm General Insurance Co. (C.D. Cal., Dec. 29, 2021) 2021 WL 6752322 at *10.

In support of its self-serving conclusion, Defendant relies upon the deposition of Ms. Figoni and records which Defendant has selectively interpreted for the Court. Defendant simply ignores everything else. However, when *all* of the information is considered it becomes quite clear that a disputed issue of fact exists which must be decided by a jury.

The records of the City of Beverly Hills reflected an increase in water usage at the Property starting in late May 2020. That increase in water usage was unknown to Plaintiffs who did not observe any leaks or other possible causes of the increase, and who were not informed of the increase until they received a letter from the City of Beverly Hills (dated June 18, 2020) which was sent by regular mail and not received until approximately June 25, 2020. DMF 11. Notably, neither the letter nor any of the City's records say, nor could they state the cause or source of the increased water usage. DMF 12. All the City's records show is increased water usage and the City's letter noted that "most" (not all) residential customers have hours where there is zero water usage and Plaintiffs' home was not showing any periods of zero water usage. DMF 13.

Upon being notified of the potential issue, Plaintiffs contacted a leak detection company, investigated, and discovered there was a toilet in a seldom used bathroom which was in fact running constantly and thus a cause of a continuous flow reading. DMF 14. Despite this, Defendant has concluded that the increase in water usage which appears to have begun in late May 2020 is attributable solely to the burst pipe within the slab foundation of the property, but there is no evidence to support this conclusion. Indeed, Ms. Figoni testified that "80 percent of the issues [she deals] with are running toilets." DMF 15.

Unlike Defendant's baseless conclusions, those with first-hand knowledge of the facts and circumstances, and those who have the requisite background and experience determined the damage at issue was ***not*** from a pinhole leak, but rather the result of sudden burst in the pipe within the slab. DMF 16. Photographic evidence supports this as do the plumber's direct contemporaneous observations of the location and the pipe in question. DMF 17. There is no evidence of any "continuous or repeated seepage or leakage of water" from the location of the burst pipe prior to it bursting.

Defendant's evidence is nothing more than carefully packaged speculation.  The fact that there was elevated usage detected for the Property as a whole around the time of the sudden burst pipe does not mean the elevated usage was due to any "continuous or repeated seepage or leakage of water" from that pipe.  This becomes especially true and important when the evidence shows, as it does here, that there was a leaking toilet in a different part of the house during this same time.  DMF 18.  In other words, although it behooves Defendant to say otherwise, the source of the elevated usage is not necessarily from any "continuous or repeated seepage or leakage of water" from the burst pipe.  That flow could just as easily have been from the leaky toilet.  Defendant confuses causation with correlation and they are not the same. This disputed issue of material fact – whether any exclusion to coverage applies under the Policy – is appropriate for resolution by the finder-of-fact at trial and alone precludes summary judgment.[3]

One decision Defendant did not cite (and the Court will have to wonder why) is a recent decision from this same Court in the matter of Gershkowitz v. State Farm General Insurance Co. (C.D. Cal., Dec. 29, 2021) 2021 WL 6752322,

---

[3] See Lawson v. Nationwide Mut. Fire Ins. Co. (D.S.C., May 3, 2010) 2010 WL 1791283, at *2 ("With regard to the… breach of contract, the plaintiffs have disputed the defendant's finding that the damage to their home was caused by a "continuous" water leak. The applicability of the policy exclusion cited by Nationwide is dependent upon determination of the underlying question of fact regarding whether the water damage to the plaintiffs' home was caused by a "continuous" or by a sudden leak. The defendant has presented evidence from which a jury could potentially conclude that the damage was caused by a continuous leak. However, the plaintiffs have proffered evidence which contradicts this conclusion. This question of fact is appropriate for resolution by the finder-of-fact at trial, and the Court cannot grant summary judgment for the defendant as a matter of law on the plaintiffs' first cause of action for breach of contract."

where State Farm's efforts to obtain summary judgment on a nearly identical breach of contract claim were denied.[4]

In Gershkowitz, plaintiffs made "an insurance claim for water damage caused by a burst pipe in their home" and "[State Farm] denied coverage pursuant to policy exclusions for wear, tear, or deterioration, and continuous or repeated seepage or leakage." Id. at * 1.  State Farm moved for summary judgment on the breach of contract claim and, just like here, although State Farm in Gershkowitz "makes much of the court's holding, the facts render Freedman inapposite." Id. at *9.  The Court explained:

> [In Freedman] the parties stipulated that a leak occurred because a contractor had, years prior, driven a nail through a pipe when replacing drywall at the insureds' home. This caused a small, nail-size hole in the pipe and "extensive" water damage: "the drywall fell apart on touch," "mold was seen on pieces of the wall[,]" and "the ceiling immediately downstairs was wet and soft." *See id.* The court held, with this in mind, that the leak would have necessarily been "continuous" or "repeated" under "any reasonable construction of those terms." *Id.*

The Gershkowitz Court made quick work of the Freedman case: "Comparatively, there is no similar "extensive" evidence of damage that necessarily occurred over a long period of time. The Court cannot conclude that

---

[4] This case should not have been difficult for Defendant to find since both the Gershkowitz matter and the one before the Court were both against State Farm and handled by not just the same law firm, but the same attorney in that firm, Steven J. Elie, Esq.  Id. at *1.

the facts here necessarily establish a "continuous or repeated seepage or leakage" of water, as the court in Freedman was able to. *See id*." Id. at * 9.

In the end, the Gershkowitz Court found a genuine dispute of material fact precluded summary judgment because "The evidence weighs in both directions: certain of Plaintiffs' findings favor a "sudden" or immediate rupture, while other of Defendants' findings favor a gradual, long-term leak." The Court found "the cause, duration, and extent of the leak were indeterminate" and that a "reasonable jury could find for either Plaintiffs or Defendant based on these facts, and summary judgment is not appropriate as a result." Id. at *10. The same is true here and summary judgment should be denied.

## C. THERE ARE DISPUTED ISSUES OF FACT REGARDING EXCLUSION FROM COVERAGE DUE TO WEAR, TEAR OR DETERIORATION.[5]

Despite everything already discussed, Defendant puts forth Ms. Figoni (an employee of the City of Beverly Hills) as the sole basis for its argument regarding exclusion of coverage due to alleged "wear, tear, and deterioration" under the Policy. Ms. Figoni is not a plumber. Indeed, she never stepped foot inside the property in question during the relevant time period. DMF 19. And she certainly never saw the burst pipe or the damage it caused. DMF 20. She has no basis in fact, training, experience or observation to offer admissible evidence regarding the cause of burst pipe. DMF 21.

Defendant puts forth no evidence at all, admissible or otherwise, regarding this exclusion and cannot do so because nobody from Defendant (or even associated with Defendant) ever came to look at the burst pipe. DMF 22.

---

[5] Later in its memorandum of points and authorities Defendant argues that there is, "at minimum," a genuine issue as to coverage. Section V(C).

In fact, Defendant's first look at the property was only several weeks after the loss was reported, conducted virtually and, as the Court can see, not one of the photographs taken by Defendant even depicts the pipe.  DMF 23-24.  ***Defendant never even requested a photo of the pipe prior to denying the claim.***  DMF 24.  In fact, the only time a photograph was provided was ***after*** the initial denial wherein Defendant falsely claimed the pipe was under the foundation; Plaintiff was compelled to provide a letter from Mainline Plumbing and a photograph depicting the pipe in the foundation, not under it.    DMF 24-25.  As the photograph confirmed, the pipe was within the foundation and had burst – there was no pinhole leak.  DMF 26.

Defendant's citation to <u>Murray v. State Farm Fire & Cas. Co.</u>, 219 Cal.App.3d 58 (1990), does not aid Defendant whatsoever.  In fact, it only serves to illustrate the fallaciousness of the argument it is supposed to support. The Court in <u>Murray</u> indeed found the exclusion based on deterioration applied, but the facts were undisputed to the point that even plaintiff's expert confirmed the pipe broke down over a fairly long period of time:

> We appreciate the possibility that there may be cases which would call into question the exact parameters of the term "deterioration." We can envision situations in which a homeowner suffers damage which is not instantaneous but nonetheless occurs over a sufficiently short period of time that it could not be characterized as deterioration. This is not such a case. ***According to one of the Murrays' own experts, the electrolysis process which caused the breakdown of the copper pipe "takes place over a fairly long period of time." He estimated the pipe may have begun leaking a year before the leak was discovered***.

Id. at 63 (emphasis added).  Here, not only is there disagreement between the parties on this issue, Defendant has no actual basis for even contending the burst pipe was the result or wear, tear, or deterioration.

### D. SUMMARY JUDGMENT CANNOT BE GRANTED BECAUSE PLAINTIFFS ARE ENTITLED TO SOME COVERAGE.

Even if Defendant's arguments were credited, and even if the Court were to look past the disputed issues of material fact, summary judgment is still improper because Plaintiffs are, at the very least, entitled to coverage for any losses that ensued from the wear and tear damage. An "ensuing damage" clause in an insurance policy "provides the homeowner with coverage for losses which flow from an excluded loss, as long as the 'ensuing' loss is not also specifically excluded".  Murray v. State Farm Fire & Casualty Co., 219 Cal.App.3d 58, 64 (1990).  Thus, a homeowner can claim coverage for damages that result from wear and tear, even though the wear and tear itself is not recoverable.

The policy in Murray (like the one here) provided the homeowner coverage for losses flowing from an excluded loss, as long as the "ensuing" loss was not also specifically excluded.  So, even if Defendant was not obligated to compensate the Plaintiffs for a "corroded water pipe" which was "deteriorated," it would nevertheless be responsible for any consequential loss resulting from the corroded pipe provided the consequential or "ensuing" loss was not itself excluded under another provision of the Policy.  Thus, when read together, the exclusion for "wear, tear or deterioration" only means that Defendant may not be obligated to compensate for the direct loss that is the result of that "wear, tear or deterioration," namely the damage to the pipe itself.  Murray at 64.

Here, the Policy does not exclude losses other than for the replacement of the pipe itself and so all of Plaintiff's other losses (the repair costs, remediation, replacement of damaged items, etc.) should have been covered under the Policy. MDF 27.  Defendant instead used the exclusion clause (assuming it even

applies) as a sword to defeat all possible claims Plaintiffs had which ensued from the loss.

### E. THE DISPUTED ISSUES OF MATERIAL FACT PRECLUDING SUMMARY JUDGMENT OF THE BREACH OF CONTRACT CLAIM ALSO PRECLUDE SUMMARY JUDGMENT OF THE SECOND CAUSE OF ACTION.

"[W]here an insurer denies coverage but a reasonable investigation would have disclosed facts showing the claim was covered, the insurer's failure to investigate breaches its implied covenant of good faith." Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062, 1074 (2007) .  The questions of whether an investigation was reasonable and whether a genuine dispute existed are ordinarily questions for the trier of fact. Gentry v. State Farm Mut. Auto Ins. Co., 726 F.Supp.2d 1160, 1167 (E.D. Cal. 2010) (citing various California cases.)

Defendant argues that the claim for breach of the covenant of good faith and fair dealing must rise or fall depending on the viability of Plaintiffs' breach of contract claim.  In support of this proposition, Defendant cites to a relies upon Waller v. Truck Ins. Exchange, Inc., 11 Cal.4th 1, 36 (1995).  The Waller decision, however, did not say and does not stand for what Defendant thinks it says or stands for.  The Waller case did not decide the good faith and fair dealing claim failed because the breach of contract claim failed. Rather, and to quote Waller:

> It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer.

(Italics in original).  Defendant herein is not disclaiming the existence of a contractual relationship with Plaintiff, nor is it arguing there was no "*potential for coverage.*"  Its position (albeit incorrect and unsupported) is that the loss is simply not a covered due to an exclusion.  These are distinct arguments and positions and Waller offers no support for Defendant under the facts and circumstances of this case.

Of course, Defendant's entire argument rests on one thing – a determination on summary judgment that there is no material issue of disputed fact and that, as a matter of law, Defendant's Policy exclusions were properly applied and there is no coverage for any of Plaintiff's losses.  As discussed in detail above, the question of whether Plaintiff's claim was properly denied is hotly contested and riddled with disputed issues of material fact.

## F.  DEFENDANT MISHANDLED THE CLAIM AND ACTED UNREASONABLY, EVEN HOSTILY, TOWARDS PLAINITFFS.

California law is clear that if Defendant's investigation was unreasonable it may be held liable for breach of the covenant of good faith and fair dealing.  Mariscal v. Old Republic Life Ins. Co., 42 Cal.App.4th 1617, 1624 (1996) ("An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing.") Plaintiffs understand that simply denying a claim does not necessarily equate to unreasonable conduct by the Defendant, but that is not the case before the Court.  As the Court can see, Defendant did not act reasonably and, as a result, did not have the information necessary to genuinely dispute its liability.  At the very least, there is a disputed issue of material fact surrounding Defendant's conduct and coverage which supports more than one reasonable inference.

Defendant ignored evidence available to it - the pipe (which it never asked to see), the leaky toilet (which Defendant knew about yet failed to

consider as a source of the increased water usage) (Rofail Decl., ¶11), the exposed drywall and wall panels free of mold (which were visible on the virtual tour), and verbal statements and plumber's invoice that the pipe was in the foundation (not under it).  DMF 28.

In fact, the evidence reflects that Defendant's handling of the claim was botched from the very start.  After the claim was submitted, Defendant did not contact the named insured or even their representative.  Rather, and inexplicably, Defendant (through a John Henry) reached out to Plaintiffs' son Lior Gamliel – a person who had no connection to this Policy or this claim and who had no idea why he was being contacted at all.[6]  DMF 29.  That delay (caused by Defendant's incompetence) was remedied not by Defendant, but by Plaintiffs who eventually learned of Defendant's misplaced contact.  DMF 30.  When Plaintiffs contacted Mr. Henry he reversed course and told Plaintiffs that he was not working on the claim and instructed Plaintiffs to start the process all over by contacting Defendant through its main number, which is what Plaintiff did.  DMF 31.

A full seventeen days after Plaintiffs had their agent file a claim, one of Defendant's claims representatives connected with Plaintiffs' son Eyal Gamliel, but that call proved to be unpleasant from the get-go.[7]  DMF 32. Defendant's representative was immediately confrontational and accusatory.  DMF 32.  She accused Plaintiffs and Eyal Gamliel of unduly delaying the claim filing and questioned Eyal Gamliel with a clear agenda – to try and obtain information that would allow Defendant to deny the claim.  DMF 32.

[6] Plaintiffs' son Eyal Gamliel was involved, not Lior.
[7] The Court should note that it took longer for Defendant to make its first contact with Plaintiffs (17 days) than it did for it to deny the claim (5 days from contact to denial).

Plaintiffs' next contact with Defendant was through Ms. Rofail who did not visit the property, but rather did a virtual tour and took photos while Eyal Gamliel conducted a video chat with her. DMF 33. This entire tour lasted about 15 minutes and was rather perfunctory as Ms. Rofail promptly told Eyal Gamliel within these fifteen minutes that the claim would be denied. DMF 33. Despite the nature of the claim and the loss, Ms. Rofail never asked to see the pipe in question to check if it was deteriorated or to see the size of the hole, which was rather large. DMF 34. Ms. Rofail was told that the floors were damaged, the wall paneling was wet, and that the broken pipe was in the foundation, not under it. DMF 34. During the virtual tour Ms. Rofail also was able to view, whether she did or not, that there was no mold in the exposed wet walls and flooring. DMF 34.

The next day, Defendant sent its first denial letter dated July 30, 2020, and which stated that the pipe was located "under the slab of your home." This statement was simply untrue. DMF 35. Furthermore, the letter concluded that: "The proximate cause of the continuous water leak was due to the failure of the plumbing line from wear, tear and/or deterioration." DMF 35. Given Defendant had not even seen the pipe or physically been to the property it is hard to imagine how Defendant could reach this proximate causation conclusion. Indeed, at this point Defendant had not even spoken with the plumber who exposed the burst pipe and repaired it. DMF 36. Defendant's behavior was unreasonable by any objective standard and as measured at the time, not today.

Defendant's directing the Court to its re-opening of the denied claim does not change this fact. Even after doing so, Defendant still never spoke to the plumber who was on site and had first-hand knowledge of the burst pipe and the damage it caused. DMF 37. If Defendant had bothered to speak with him Defendant would have learned that this licensed professional with 18 years of experience who has worked on countless burst pipes exposed what was in his

professional opinion a sudden burst pipe within the foundation of the property, not a pinhole leak of a continuous nature.  DMF 38.

Had Defendant bothered to inquire, the plumber also would have told Defendant of the conditions he observed or, more importantly, did not observe. He observed no signs of mold anywhere, including in the drywall.  DMF 38.  He observed no signs of long-term water damage such as rot, spongy or soft wood, or odor.  DMF 38.  In short, there were no signs at all of any extended exposure to moisture and thus no evidence of continuous leakage or seepage.  See Downey Sav. & Loan Assn. v. Ohio Cas. Ins. Co., 189 Cal.App.3d 1072, 1083 (1987) (finding bad faith where "no attempt" made by insurer to interview "any" of the persons involved in transaction); Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062, 1074 (2007) ("where an insurer denies coverage but a reasonable investigation would have disclosed facts showing the claim was covered, the insurer's failure to investigate breaches its implied covenant."); Wilson v. 21st Century Ins. Co., 42 Cal.4th 713, 721 (2007) ("it is essential that an insurer fully inquire into possible bases that might support the insured's claim" before denying it.); Mariscal v. Old Republic Life Ins. Co., 42 Cal.App.4th 1617, 1623 (1996) ("A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim.").

Nor did Defendant speak with anyone from the City of Beverly Hills, relying instead on its own self-serving interpretation of the documents and selected information it gathered.  DMF 39.  See Gruenberg v. Aetna Ins. Co., 9 Cal.3d 566, 578 (1973) (bad faith found where insurer made no effort to obtain information from other sources).  *Ms. Figoni never spoke to Defendant*.  DMF 39.  She also testified at her deposition that 80% of the issues she sees are related to leaking toilets, that there was no possible way Plaintiffs could have known of

an issue before she notified them of increased water usage in her June 18, 2020, letter, that Plaintiffs acted quite rapidly in her view, and she has no first-hand knowledge of the nature or location of the leak.  DMF 39.

Instead of doing what should have been done (properly investigate and reverse the denial), Defendant quickly revised the denial letter, changed the location of the pipe to its actual location, and changed the causation language, striking "proximate cause" altogether and replacing that sentence with "It appears the predominate cause of the continuous water leak was due to the failure of the plumbing line from wear, tear and/or deterioration."  DMF 40.

The timeline of events is critical to understand.  Defendant admits that its first substantive conversation about the claim took place on July 24.  DMF 46. Just five days later, on July 29 and before the virtual tour had concluded, before Defendant had spoken to the plumber, the leak detection company, or the City of Beverly Hills, Defendant had seen and heard enough.  DMF 33-36.   Coverage denied.  No matter that Defendant was informed of the leaking toilet and that part of the reason for the delay in locating the burst pipe was that Plaintiffs were advised to first check for leaky toilets.  After Defendant was forced to reopen the claim at the behest of its procuring broker, Defendant went through the motions and spoke to the leak detection company on August 19, but still never spoke with the plumber who did the work or the City of Beverly Hills.  DMF 41. That same day Defendant informed Plaintiffs' insurance broker that the claim was still denied.  DMF 41.  The formality of the denial letter followed on August 24, 2020 – a letter that changed the location of the pipe and changed the causation language.  DMF 41.

From the foregoing it is reasonable to conclude (or at least infer) that Defendant simply went through the motions in order to be able to make the very argument it is now making.  In doing so, Defendant acted unreasonably. In doing

so, Defendant could not reasonably dispute coverage because it did not even have the information needed to do so.

### G. THE QUESTION OF PUNITIVE DAMAGES IS THE SUBJECT OF DISPUTED MATERIAL FACTS AND MUST BE LEFT TO A JURY TO DECIDE.

Courts have recognized the importance of a punitive damage award in the context of an insurers unreasonable breach of an insurance contract. The Court in <u>Griffin Dewatering Corp. v. Northern Ins. Co. of New York</u>, 176 Cal.App.4th 172 (2009), summed it up quite well:

> Insurance contracts are unique in that, if the insurance company breaches them, the policyholder suffers a loss (often a catastrophic loss) that cannot, by definition, be compensated by obtaining another contract. [Citations.] [¶] Thus, without the possibility of tort damages hanging over its head when it makes a claims decision, an insurance company may choose not to deal in good faith when a policyholder makes a claim. The insurance company could arbitrarily deny a claim, thus gambling with the policyholder's 'benefits of the agreement.' [Citation.] If the insurance company gambled wrong, it would be no worse off than it would have been if it had honored the claim in the first place. In effect, if the law confined the exposure of the insurance company under such circumstances to only contract damages, it would be pardoned and still retain the fruits of its offense.

<u>Id</u>. at 195.

"Summary judgment on the issue of punitive damages is only appropriate where "no reasonable jury could find the plaintiff's evidence to be clear and

convincing proof of malice, fraud, or oppression.”” O'Brien as Trustee of Raymond F. O'Brien Revocable Trust v. XPO CNW, Inc. (N.D. Cal. 2018) 362 F.Supp.3d 778, 787. Plaintiffs need only present evidence which could, if accepted by the jury, satisfy the clear and convincing standard of proof. Stewart v. Truck Ins. Exchange, 17 Cal.App.4th 468, 482 (1993). "Malice" means "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others," and "oppression" means "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code § 3294(c).

"As the court in Egan v. Mutual of Omaha Insurance Co., 24 Cal.3d 809, 819, (1979), explained, "an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial."" Ward v. Allstate Ins. Co. (C.D. Cal. 1997) 964 F.Supp. 307, 312–313. Sufficient evidence to support punitive damages were found in Betts v. Allstate Ins. Co.,154 Cal.App.3d 688, 709 (1984), where the Court found substantial evidence supported a finding that the insurer intended to vex, injure, and annoy." In this regard, the Betts Court noted a scenario and progression that is quite similar to what is before the Court now, noting:

> Evidence abounds of an irrational refusal to face up to adverse evidence. From almost the day of commencement of its duty to represent, defend and indemnify Betts, Allstate adopted an objectively unreasonable "no liability/no pay/defend" stance. This obstinate attitude-intent grew in strength in face of evidence piled upon evidence pointing to liability….

Id. at 709.

As discussed and detailed earlier, and incorporated herein by reference, Defendant did not just deny a valid claim; it misstated facts, ignored evidence, failed to investigate the claim thoroughly and objectively and, as such, by definition, acted capriciously and arbitrarily, disregarding Plaintiffs' rights and causing them damage.  See Pulte Home Corp. v. American Safety Indemnity Co. 14 Cal.App.5th 1086, 1126 (2017) (finding Civil Code § 3294 satisfied where denial letters included misrepresentations that amounted to clear and convincing evidence of malice and oppression).  The evidence of Defendant's behavior in connection with this loss and this claim could certainly be accepted by the jury and satisfy the clear and convincing standard of proof.

**III.    CONCLUSION**

Disputed issues of material fact abound.  As such, and based on the foregoing, Defendant's motion should be denied.

DATED: February 14, 2022          LAW OFFICES OF DAVID N. LAKE

By: _____

DAVID N. LAKE

Attorneys for Plaintiffs

## PROOF OF SERVICE
## STATE OF CALIFORNIA , COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of . My business address is 16130 Ventura Blvd., Suite 650, Encino, CA 91436.

On February 14, 2022, I served true copies of the following document(s) described as **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND/OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** on the interested parties in this action as follows:

Steven J. Elie, Esq.
Laura K. Kim, Esq.
MUSICK, PEELER & GARRETT LLP
624 South Grand Avenue, Suite 2000
Los Angeles, California 90017-3383
Telephone (213) 629-7600
Facsimile (213) 624-1376
  s.elie@musickpeeler.com
  l.kim@musickpeeler.com
(Counsel for Defendant)

**BY EMAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from email address david@lakelawpc.com to counsel at the email address shown above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 14, 2022, at Encino, California.

_____
David N. Lake