David N. Lake, State Bar No. 180775
**LAW OFFICES OF DAVID N. LAKE,**
  **A Professional Corporation**
16130 Ventura Boulevard, Suite 650
Encino, California 91436
Telephone: (818) 788-5100
Facsimile: (818) 479-9990
david@lakelawpc.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| MAZLIACH GAMLIEL AND PNINA GAMLIEL, INDIVIDUALLY AND AS TRUSTEES OF THE GAMLIEL FAMILY TRUST DATED JULY 31, 2008, | ) Case No. 2:21-cv-03427 MWF (DFMx) ) ) (Case Assigned to Hon. Michael W. ) Fitzgerald) ) |
| Plaintiffs, | ) **PLAINTIFFS' STATEMENT OF** ) **GENUINE DISPUTES OF** |
| vs. | ) **MATERIAL FACT AND** ) **CONCLUSIONS OF LAW IN** ) **SUPPORT OF PLAINTIFFS'** |
| STATE FARM GENERAL INSURANCE COMPANY, AN ILLINOIS CORPORATION, AND DOES 1 TO 25, INCLUSIVE | ) **OPPOSITION TO DEFENDANT'S** ) **MOTION FOR SUMMARY** ) **JUDGMENT AND/OR, IN THE** ) **ALTERNATIVE, PARTIAL** |
| Defendants. | ) **SUMMARY JUDGMENT** ) |
| | ) Date:           March 7, 2022 ) Time:           10:00 am ) Courtroom.:  5A |
| | ) |

---

Statement of Disputed Facts In Support Of Opposition to Motion for Summary Judgment
1

Plaintiffs MAZLIACH GAMLIEL AND PNINA GAMLIEL, INDIVIDUALLY AND AS TRUSTEES OF THE GAMLIEL FAMILY TRUST DATED JULY 31, 2008 ("Plaintiffs") submit the following Statement of Genuine Disputes of Material  Fact ("DMF") pursuant to Local Rule 56-2:

| DMF | Fact | Supporting Evidence |
|---|---|---|
| 1 | Defendant State Farm ("Defendant") began by insisting, wrongly on July 30, 2020, that the pipe was under the foundation. | Declaration of Eyal Gamliel ("Eyal Decl."), ¶ 17; Exhibit 5. |
| 2 | Defendant later, in a subsequent letter in August 2020, shifted to an exclusion about the leak being continuous. | Eyal Decl., ¶ 18, Exhibit 6. |
| 3 | The pipe is in the property's foundation and Defendant knew this and was told this before it sent its first denial letter on July 30, 2020. | Eyal Decl., ¶ 9. |
| 4 | The pipe had a large hole, not a pinhole. | Cesar Anorga ("Cesar Decl."), ¶ 7; Eyal Decl., ¶ 12, Declaration of Mazliach Gamliel ("Mazliach Decl."), ¶ 5 |
| 5 | There was no evidence of mold anywhere in the area of the burst pipe. | Eyal Decl., ¶ 8; Cesar Decl., ¶ 6, |

| | | |
|---|---|---|
| | | Mazliach Decl., ¶ 5. |
| 6 | There was no evidence of rot anywhere in the area of the burst pipe. | Eyal Decl., ¶ 8; Cesar Decl., ¶ 6, Mazliach Decl., ¶ 5. |
| 7 | There was no evidence of soft or spongy wood anywhere in the area of the burst pipe. | Eyal Decl., ¶ 8; Cesar Decl., ¶ 6 Mazliach Decl., ¶ 5. |
| 8 | There was no musty odor anywhere in the area of the burst pipe. | Eyal Decl., ¶ 8; Cesar Decl., ¶ 6 Mazliach Decl., ¶ 5. |
| 9 | There was a leaking toilet in the property during the same period of time as there was the issue with the burst pipe. | Eyal Decl., ¶ 5; Mazliach Decl., ¶ 4. |
| 10 | There was no evidence of a continuous leak from the pipe. | Cesar Decl., ¶ 4-7; Eyal Decl., ¶ 8; Mazliach Decl., ¶ 5; Declaration of Ranelle Anorga ("Ranelle Decl."), ¶ 3, Exhibit 1 thereto. |
| 11 | Plaintiffs were unaware of any increase in water usage at the Property until they received a letter from the City of Beverly Hills (dated June 18, 2020) which was dispatched by regular mail and not received until approximately June 25, 2020. | Eyal Decl., ¶ 4; Mazliach Decl., ¶ 3. |
| 12 | Neither the City's letter nor any of the City's records say, nor could they state the | Eyal Decl., ¶ 4; Kim Decl., ¶6, Exhibit 15 |

| | | cause or source of the increase in water usage. | (page 40 – Exhibit 4 to Figoni Depo.). |
|---|---|---|---|
| | 13 | All the City's records show is increased water usage and the City's June 18, 2020, letter noted that "most" (not all) residential customers have hours where there is zero water usage and Plaintiffs' home was not showing any periods of zero water usage. | Eyal Decl., ¶ 4; Kim Decl., ¶6, Exhibit 15 (page 40 – Exhibit 4 to Figoni Depo.). |
| | 14 | Upon being notified of the potential issue, Plaintiffs contacted a leak detection company, investigated, and discovered there was a toilet in a seldom used bathroom which was in fact running constantly and thus a cause of a continuous flow reading. | Eyal Decl., ¶ 5; Mazliach Decl., ¶ 4. |
| | 15 | Ms. Debby Figoni who works for the City of Beverly Hills testified that "80 percent of the issues [she deals] with are running toilets." | Lake Decl., Exhibit 7 (Figoni Depo.), 50:4-20. |
| | 16 | Those with first-hand knowledge of the facts and circumstances, and those who have the requisite background and experience determined the damage at issue was not from a pinhole leak, but rather the result of sudden burst in the pipe within the slab. | Cesar Decl., ¶ 4-7; Eyal Decl., ¶ 7-9. |
| | 17 | Photographic evidence shows the leak was not a pinhole leak, but rather the result of a sudden burst in the pipe within the slab. | Ranelle Decl., ¶ 3, Exhibit 1 thereto. |

| 18 | Evidence of elevated usage detected for the property as a whole around the time of the sudden burst pipe does not mean the elevated usage was due to any "continuous or repeated seepage or leakage of water" from that pipe, especially because there was a leaking toilet in a different part of the house during this same time. | Mazliach Decl., ¶ 4. |
|---|---|---|
| 19 | Ms. Figoni has never stepped foot inside the property in question until well after Defendant had twice denied the claim. | Lake Decl., Exhibit 7 (Figoni Depo.), 70:11-22, 71:10-16. |
| 20 | Ms. Figoni never saw the burst pipe or the damage it caused. | Lake Decl., Exhibit 7 (Figoni Depo), 70:11-22, 71:10-16. |
| 21 | Ms. Figoni has no basis in fact, training, experience or observation to offer admissible evidence regarding the cause of burst pipe. | Lake Decl., Exhibit 7 (Figoni Depo), 70:11-22, 71:10-16. |
| 22 | Neither Defendant nor anyone associated with Defendant ever came to look at the burst pipe. | Eyal Decl., ¶ 12. |
| 23 | Defendant's first look at the property was several weeks after the loss was reported and took place during virtual tour. | Eyal Decl., ¶ 12. |
| 24 | None of photographs taken by Defendant depicts the pipe and Defendant never even requested a photo of the pipe prior to its first denial of the claim. | Rofail Decl., Exhibit 6; Eyal Decl., ¶ 19. |

| 25 | Plaintiffs' plumber exposed and observed the burst pipe and an invoice and photograph of the location of the pipe was provided to Defendant. This evidence of the location of the burst pipe was provided to Defendant because Defendant had denied the claim based on mislocating the pipe as being under instead of within the foundation and without Defendant even asking for evidence of its actual location. | Eyal Decl., ¶ 6, 7, 19; Ranelle Decl., ¶ 3, Exhibit 1. Cesar Decl., ¶ 3-5, Exhibit 2. |
| --- | --- | --- |
| 26 | Plaintiffs' plumber confirmed for Defendant that the pipe was within the foundation and had burst – there was no pinhole leak. | Eyal Decl., ¶ 7, 9; Ranelle Decl., ¶ 3-4. |
| 27 | The Policy does not exclude losses other than for the replacement of the pipe itself and so all of Plaintiffs' other losses (the repair costs, remediation, replacement of damaged items, etc.) should have been covered under the Policy. | Declaration of Sean T. Moore, ¶ 2, Exhibit 1. |
| 28 | Defendant ignored evidence available to it - the pipe (which it never asked to see), the leaky toilet (which Defendant knew about yet failed to consider as a source of the increased water usage), the exposed drywall and wall panels free of mold (which were visible on the virtual tour), and verbal statements and plumber's invoice that the pipe was in the foundation (not under it). | Eyal Decl., ¶ 5, 8; Ranelle Decl., ¶ 3-4; Declaration of Stephanie Rofail ("Rofail Decl."), ¶11. |

| 29 | After the claim was submitted, Defendant did not contact the named insured or even their representative.  Rather, Defendant (through a John Henry) reached out to Plaintiffs' son Lior Gamliel – a person who had no connection to this Policy or this claim and who had no idea why he was being contacted at all. | Eyal Decl., ¶ 10. |
|---|---|---|
| 30 | That delay (caused by Defendant's incompetence) was remedied not by Defendant, but by Plaintiffs who eventually learned of Defendant's misplaced contact. | Eyal Decl., ¶ 10-12. |
| 31 | When Plaintiffs contacted Mr. Henry he reversed course and told Plaintiffs that he was not working on the claim and instructed Plaintiffs to start the process all over by contacting Defendant through its main number, which is what Plaintiff did. | Eyal Decl., ¶ 10. |
| 32 | A full seventeen days after Plaintiffs had their agent file a claim, one of Defendant's claims representatives connected with Plaintiffs' son Eyal Gamliel, but that call proved to be unpleasant from the get-go. Defendant's representative was immediately confrontational and accusatory.  She accused Plaintiffs and Eyal Gamliel of | Eyal Decl., ¶ 9-11. |

| | | | |
|---|---|---|---|
| | | unduly delaying the claim filing and questioned Eyal Gamliel with a clear agenda – to try and obtain information that would allow Defendant to deny the claim. | |
| | 33 | Plaintiffs' next contact with Defendant was through Ms. Rofail who did not visit the property, but rather did a virtual tour and took photos while Eyal Gamliel conducted a video chat with her.  This entire tour lasted about 15 minutes and was rather perfunctory as Ms. Rofail  promptly told Eyal Gamliel within these fifteen minutes that the claim would be denied. | Eyal Decl., ¶ 12-15. |
| | 34 | Despite the nature of the claim and the loss, Ms. Rofail never asked to see the pipe in question to check if it was deteriorated or to see the size of the hole, which was rather large.  Ms. Rofail was told that the floors were damaged, the wall paneling was wet, and that the broken pipe was in the foundation, not under it.  During the virtual tour Ms. Rofail also was able to view, whether she did or not, that there was no mold in the exposed wet walls and flooring. | Eyal Decl., ¶ 12-15. |
| | 35 | The next day, Defendant sent its first denial | Eyal Decl., ¶ 12-17. |

| | | |
|---|---|---|
| | letter dated July 30, 2020, and which stated that the pipe was located "under the slab of your home."  This statement was simply untrue.  Furthermore, the letter concluded that: "The proximate cause of the continuous water leak was due to the failure of the plumbing line from wear, tear and/or deterioration." | |
| 36 | At this point Defendant had not even spoken with the plumber who exposed the burst pipe and repaired it. | Ranelle Decl., ¶ 4; Rofail Decl., 12; Cesar Decl., ¶ 8. |
| 37 | Even after re-opening the claim, Defendant still never spoke to the plumber who was on site and had first-hand knowledge of the burst pipe and the damage it caused. | Cesar Decl., ¶ 8. |
| 38 | Had Defendant bothered to inquire, the plumber also would have told Defendant of the conditions he observed or, more importantly, did not observe.  He observed no signs of mold anywhere, including in the drywall.  He observed no signs of long-term water damage such as rot, spongy or soft wood, or odor. | Cesar Decl., ¶ 4-7. |
| 39 | Nor did Defendant speak with anyone from the City of Beverly Hills, relying instead on its own self-serving interpretation of the documents and selected information it gathered.  Ms. Figoni never spoke to | Lake Decl., Exhibit 7  (Figoni Depo), 72:10-13, 29:18-30:4, 50:4-20, 65:4-24. |

| | | |
|---|---|---|
| | Defendant. She also testified at her deposition that 80% of the issues she sees are related to leaking toilets, that there was no possible way Plaintiffs could have known of an issue before she notified them of increased water usage in her June 18, 2020, letter, that Plaintiffs acted quite rapidly in her view, and she has no first-hand knowledge of the nature or location of the leak. | |
| 40 | Rather than properly investigate and reverse the denial, Defendant quickly revised the denial letter, changed the location of the pipe to its actual location, and changed the causation language, striking "proximate cause" altogether and replacing that sentence with "It appears the predominate cause of the continuous water leak was due to the failure of the plumbing line from wear, tear and/or deterioration." | Eyal Decl., ¶ 18. |
| 41 | After Defendant was forced to reopen the claim at the behest of its procuring broker, Defendant went through the motions and spoke to the leak detection company on August 19, but still never spoke with the plumber who did the work or the City of Beverly Hills. That same day Defendant informed Plaintiffs' insurance broker that | Cesar Decl., ¶ 8; Eyal Decl., ¶ 18, Exhibit 6. |

| | | |
|---|---|---|
| | the claim was still denied.  The formality of the denial letter followed on August 24, 2020 – a letter that changed the location of the pipe and changed the causation language. | |
| 42 | Eyal Gamliel contacted State Farm agent (Lipman) as early as July 2, 2020, but was told to wait until the leak source was located because there would be no coverage if the leak were under the concrete foundation. | Eyal Decl., ¶¶ 5, 6. |
| 43 | On July 7, 2020, Eyal contacted Ms. Lipman to inform her to proceed with the claim since the burst pipe was actually in the foundation. | Eyal Decl., ¶ 9. |
| 44 | The loss was not reported on July 14, 2020. | Eyal Decl., ¶ 9. |
| 45 | Delays were caused by Defendant's internal confusion and incompetence in making contact with Eyal. | Eyal Decl., ¶¶ 9-11. |
| 46 | There was no substantive discussion with anyone at State Farm until July 24, 2020, when they spoke to Eyal. | Eyal Decl., ¶ 11. |
| 47 | The leak was located within the foundation, underneath the cabinets and marble floor, and the water became visible after the area was exposed | Eyal Decl., ¶5, 7; Mazliach Decl. ¶4, Exhibit 3; Cesar Decl., ¶ 4. |
| 48 | Eyal mentioned to Ms. Rofail that Plaintiffs noticed loose marble tiles but this was in | Eyal Decl., ¶ 15; Mazliach Decl. ¶ 6. |

| | | |
|---|---|---|
| | hindsight, meaning it was not something that caused concern until Plaintiffs found out about the burst pipe.  The loose tiles were noticed around the end of June. Additionally, for clarification, the loose tiles were not located where the pipe burst. Rather, the loose tiles were in a nearby hallway, under an area rug and since the marble tiles are the original flooring from 1987 there are and have occasionally been other loose tiles in the house in areas nowhere near the location of the burst pipe. | |
| 49 | Eyal mentioned to Ms. Rofail that there was an unusual, elevated water usage for a month and a half, which was based on the graphs provided by the City of Beverly Hills.  Eyal, however, had no way to know whether that was attributable solely to the leaky toilet or the burst pipe, or both. | Eyal Decl., ¶ 16. |
| 50 | Goldak did not say that the plumbing supply "failed", implying deterioration. Goldak merely said that the source of the water was the cold water supply line in the foundation. | Eyal Decl., ¶5, 7; Mazliach Decl., ¶4, Exhibit 3. |
| 51 | Ranelle Anorga is not a plumber but rather an administrator.  She did not visit the Property. | Ranelle Decl., ¶ 2. |
| 52 | The underside of the marble was saturated | Cesar Decl., ¶ 4; |

| | | |
|---|---|---|
| | with water. | Ranelle Decl., ¶ 3 and Exhibit 1; Eyal Decl., ¶ 7. |
| 53 | Goldaks' report confirms the leak was located under inaccessible "cabinets" that divided the dining room from the hallway. | Mazliach Decl., Exhibit 3. |

## CONCLUSIONS OF LAW

1.      "[A] court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy." Bank of the West v. Superior Court, 2 Cal.4th 1254, 1265 (1992).

2.      When considering the applicability of the exclusion, the Court must be mindful of the fact that "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured ... [whereas] exclusionary clauses are interpreted narrowly against the insurer. ... Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. The exclusionary clause must be conspicuous, plain and clear. This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded." MacKinnon v. Truck Ins. Exchange (2003) 31 Cal.4th 635, 648 (internal citations and quotations omitted); Kinsale Insurance Company v. Golden Beginnings, LLC (C.D. Cal., Sept. 15, 2021) 2021 WL 4205059, at *5 ("While insurance "coverage is interpreted broadly so as to afford the greatest possible protection to the insured," "exclusionary clauses are interpreted narrowly against the insurer.") (citation omitted); West Coast Hotel Management, LLC v. Berkshire

Hathaway Guard Insurance Companies (C.D. Cal. 2020) 498 F.Supp.3d 1233, 1241 ("Typically, the insurer bears the burden of proving the applicability of an exclusion.")

3.    A determination regarding ambiguity of language in an insurance policy cannot be decided in the abstract, but rather must be made on an individual case-by-case basis applying the language to the specific facts of the case. E.M.M.I. Inc. v. Zurich American Ins. Co. (2004) 32 Cal.4th 465, 470.

4.    California courts have ruled that when a genuine dispute exists as to the exclusion based on "continuous or repeated seepage or leakage of water", summary judgment may not be awarded.  Gershkowitz v. State Farm General Insurance Co. (C.D. Cal., Dec. 29, 2021) 2021 WL 6752322 at *10; Lawson v. Nationwide Mut. Fire Ins. Co. (D.S.C., May 3, 2010) 2010 WL 1791283, at *2.

5.    An "ensuing damage" clause in an insurance policy "provides the homeowner with coverage for losses which flow from an excluded loss, as long as the 'ensuing' loss is not also specifically excluded".  Murray v. State Farm Fire & Casualty Co. (1990) 219 Cal.App.3d 58, 64.

6.    When read together, the exclusion for "wear, tear or deterioration" only means that Defendant may not be obligated to compensate for the direct loss that is the result of that "wear, tear or deterioration," namely the damage to the pipe itself.  Murray v. State Farm Fire & Casualty Co. (1990) 219 Cal.App.3d 58, 64.

7.    "[W]here an insurer denies coverage but a reasonable investigation would have disclosed facts showing the claim was covered, the insurer's failure to investigate breaches its implied covenant [of good faith." [cite Jordan].

8.    The questions of whether an investigation was reasonable and whether a genuine dispute existed are ordinarily questions for the trier of fact. Gentry v. State Farm Mut. Auto Ins. Co., (2010) 726 F.Supp.2d 1160, 1167 (E.D. Cal.) (citing various California cases.)

9.      California law is clear that if the insurer's investigation was unreasonable it may be held liable for breach of the covenant of good faith and fair dealing. Mariscal v. Old Republic Life Ins. Co., (1996) 42 Cal.App.4th 1617, 1624 ("An insurance company may not ignore evidence which supports coverage. If it does so, it acts unreasonably towards its insured and breaches the covenant of good faith and fair dealing.")

10.     An insurer's failure to contact the persons involved in the incident, those with first-hand knowledge, can support a finding of bad faith.  See Downey Sav. & Loan Assn. v. Ohio Cas. Ins. Co., 189 Cal.App.3d 1072, 1083 (1987) (finding bad faith where "no attempt" made by insurer to interview "any" of the persons involved in transaction); Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062, 1074 (2007) ("where an insurer denies coverage but a reasonable investigation would have disclosed facts showing the claim was covered, the insurer's failure to investigate breaches its implied covenant."); Wilson v. 21st Century Ins. Co., 42 Cal.4th 713, 721 (2007) ("it is essential that an insurer fully inquire into possible bases that might support the insured's claim" before denying it.); Mariscal v. Old Republic Life Ins. Co., 42 Cal.App.4th 1617, 1623 (1996) ("A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim.").

11.     An insurer's failure to make any effort to obtain information from other sources with knowledge can support a finding of bad faith.  See Gruenberg v. Aetna Ins. Co. (1973) 9 Cal.3d 566, 578 (bad faith found where insurer made no effort to obtain information from other sources).

12.     Punitive damage awards in the context of an insurers unreasonable breach of an insurance contract have been recognized as important.  Griffin Dewatering Corp. v. Northern Ins. Co. of New York (2009) 176 Cal.App.4th 172, 195.

13. "Summary judgment on the issue of punitive damages is only appropriate where "no reasonable jury could find the plaintiff's evidence to be clear and convincing proof of malice, fraud, or oppression."" O'Brien as Trustee of Raymond F. O'Brien Revocable Trust v. XPO CNW, Inc. (N.D. Cal. 2018) 362 F.Supp.3d 778, 787.

14. Plaintiffs need only present evidence which could, if accepted by the jury, satisfy the clear and convincing standard of proof for punitive damages. Stewart v. Truck Ins. Exchange, 17 Cal.App.4th 468, 482 (1993).

15. "[A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." Ward v. Allstate Ins. Co. (C.D. Cal. 1997) 964 F.Supp. 307, 312–313, citing Egan v. Mutual of Omaha Insurance Co., 24 Cal.3d 809, 819, (1979)

16. An insurer's refusal to face up to adverse evidence supports a finding of bad faith and punitive damages. Betts v. Allstate Ins. Co. (1984) 154 Cal.App.3d 688, 709 ("Evidence abounds of an irrational refusal to face up to adverse evidence. From almost the day of commencement of its duty to represent, defend and indemnify Betts, Allstate adopted an objectively unreasonable "no liability/no pay/defend" stance. This obstinate attitude-intent grew in strength in face of evidence piled upon evidence pointing to liability . . . ."); Pulte Home Corp. v. American Safety Indemnity Co. (2017) 14 Cal.App.5th 1086, 1126 (finding Civil Code § 3294 satisfied where denial letters included misrepresentations that amounted to clear and convincing evidence of malice and oppression).

DATED: February 14, 2022                    LAW OFFICES OF DAVID N. LAKE


                                            By: _____
                                                DAVID N. LAKE
                                                Attorneys for Plaintiffs

## PROOF OF SERVICE
## STATE OF CALIFORNIA , COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Los Angeles, State of . My business address is 16130 Ventura Blvd., Suite 650, Encino, CA 91436.

On February 14, 2022, I served true copies of the following document(s) described as **PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND/OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** on the interested parties in this action as follows:

Steven J. Elie, Esq.
Laura K. Kim, Esq.
MUSICK, PEELER & GARRETT LLP
624 South Grand Avenue, Suite 2000
Los Angeles, California 90017-3383
Telephone (213) 629-7600
Facsimile (213) 624-1376
  s.elie@musickpeeler.com
  l.kim@musickpeeler.com
(Counsel for Defendant)

**BY EMAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from email address david@lakelawpc.com to counsel at the email address shown above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 14, 2022, at Encino, California.

_____
David N. Lake